HEATHER E. WILLIAMS, SBN 122664
Federal Defender
CHRISTINA SINHA, SBN 278893
MIA CRAGER, SBN 300172
Assistant Federal Defenders
Designated Counsel for Service
801 I Street, Third Floor
Sacramento, CA 95814
T: (916) 498-5700 / F: (916) 498-5710

Attorneys for Defendant
NOE FELIX GUADALUPE

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No.  2:18-CR-240-TLN |
| | ) |
| Plaintiff, | ) **NOTICE OF MOTION AND MOTION TO** |
| | ) **DISMISS INDICTMENT BECAUSE** |
| vs. | ) **CHARGING STATUTE IS** |
| | ) **UNCONSTITUTIONAL** |
| NOE FELIX GUADALUPE, | ) |
| | ) Date:   July 14, 2022 |
| Defendant. | ) Time: 9:30 A.M. |
| | ) Judge: Hon. Troy L. Nunley |

TO   UNITED   STATES   ATTORNEY   PHILLIP   A.   TALBERT   AND   ASSISTANT
UNITED   STATES   ATTORNEYS   SAMUEL   STEFANKI   AND   SHEA   KENNY,   COUNSEL
FOR PLAINTIFF:

**PLEASE TAKE NOTICE** that on July 14, 2022, or as soon thereafter as the matter may
be heard, Mr. Guadalupe will move for a dismissal of the indictment because the charging statute,
8 U.S.C. § 1326, was enacted with a discriminatory purpose and still inflicts a disparate impact,
and is therefore presumptively unconstitutional.

# TABLE OF CONTENTS

**MOTION** ........................................................................................................................... 1

**MEMORANDUM OF POINTS AND AUTHORITIES** .................................................... 1

I.      Summary of the issue. ...................................................................................... 1

II.     Active Ninth Circuit litigation. ....................................................................... 2

III.    *Arlington Heights* applies to this challenge. .................................................. 2

    A.   Three categories of Fifth Amendment Equal Protection challenges to racist legislation. 2

    B.   *Arlington Heights* applies to arguments like Mr. Guadalupe's, which fall in the third category. ...................................................................................................... 3

    C.   The *Arlington Heights* framework for examining challenged statutes. .......... 3

    D.   *Arlington Heights* has been used regularly to invalidate racially discriminatory laws that are facially neutral, including in the immigration context. ............................ 4

    E.   The deferential immigration standard (rational basis) is inapplicable. ........... 5

IV.     Applying *Arlington Heights*, 8 U.S.C. § 1326 was enacted with a racially discriminatory purpose. ................................................................................... 5

    A.   (Factor 1) Historical background of the enaction of section 1326. ................. 6

    B.   (Factor 2) Events leading up to the challenged action. .................................. 8

    C.   (Factor 3) Relevant legislative and administrative history .............................. 9

    D.   (Factor 4) Legislature's departure from normal procedures or substantive conclusions. ...................................................................................................................... 14

    E.   (Factor 5) Impact of the official action (and whether it bears more heavily on one race than another). ............................................................................................. 15

    F.   The original and current versions of the law are substantially similar. ......... 15

    G.   Subsequent reenactments do not change the analysis of whether the original law is unconstitutional under *Arlington Heights*. ............................................. 16

V.      Section 1326 has a disparate impact on Latinx people. ................................. 17

VI.     The burden shifts to the government to prove section 1326 would have been enacted absent the racial motivation.  They cannot do so. ........................................ 20

VII.    Section 1326 is unconstitutional. ................................................................... 20

1

## TABLE OF AUTHORITIES

2

**Federal Cases**                                                               **Page(s)**

3

*Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015) ........................................................... 4, 14, 18-19

4

*Arlington Heights. Hunt*, 526 U.S. ...................................................................................... 20

5

*Ave. 6E Investments, LLC v. City of Yuma, Ariz.*, 818 F.3d 493 (9th Cir. 2016) ............... 8, 14, 18

6

*Buck v. Bell*, 274 U.S. 200 (1927) ......................................................................................... 6

7

*Democratic National Committee*, 948 F.3d 989 ................................................................ 13, 14

8

*Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020) ......................................... 16, 17

9

*Hernández* ............................................................................................................................ 15

10

*Hunter v. Underwood*, 471 U.S. 222 (1985) ...................................................................... *passim*

11

*La Clinica de la Raza v. Trump*, _ F. Supp. 3d _, (N.D. Cal. 2020) ............................................ 5

12

*Loving v. Virginia*, 388 U.S. 1 (1967) ............................................................................ 2, 3, 4, 5

13

*Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142 (9th Cir. 2013) ........... 14

14

*Ramos v. Nielsen*, 321 F. Supp. 3d 1083 (N.D. Cal. 2018) ...................................................... 5, 17

15

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476 (9th Cir. 2018) ........ 5

16

*Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017) .................................................................. 2

17

*The Committee Concerning Community Improvement v. City of Modesto*, 583 F.3d 690 (9th Cir. 2009) ................................................................................................................... 18, 19

18

19

*United States v. Carrillo-Lopez*, 2021 U.S. Dist. LEXIS 155741 ............................................... 2

20

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977) ............................................................................................................................ *passim*

21

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ............................................................................... 2-3

22

**Federal Statutes**

23

8 U.S.C. § 1326 ................................................................................................................. *passim*

24

**Other**

25

U.S. Const. Amend. V ...................................................................................................... 2, 15, 16

26

Mae M. Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* (William Chafe, et al. eds., 2004) ................................................................................... 7, 8, 9, 10

27

28

Daniel Okrent, *The Guarded Gate: Bigotry, Eugenics, and the Law That Kept Two Generations of Jews, Italians, and Other European Immigrants Out of America* (2019) .......... 10

**MOTION**

For the below-detailed reasons, Mr. Guadalupe, by and through counsel, hereby respectfully moves this Honorable Court to dismiss the indictment in this case. As detailed below, the history of the charging statute, 8 U.S.C. § 1326, clearly shows that it was enacted with a discriminatory purpose; that it still inflicts a disparate impact today; and is therefore presumptively unconstitutional under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). Resultantly, the burden shifts to the government to show that the original version of the statute, passed in 1929, would have passed through Congress even without the discriminatory purpose. The government cannot meet this burden, and upon their failure to do so, the Court must dismiss the indictment against Mr. Guadalupe.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    Summary of the issue.**

Section 1326 of Title 8 of the United States Code, or the "Undesirable Aliens[1] Act of 1929," as it was originally known, was enacted with the intent to keep American blood white and 'pure.' It was specifically conceived of as a way to attempt to ensure that the Mexican race[2] would not comingle with white Americans and 'contaminate' their blood. The enactors of this law were particular concerned about the "country to the south of the Rio Grande and the islands" because, as they put it, their blood is "composed of a mixture blood of white, Indian, and negro," which makes "their blood a very great penalty upon the society which assimilates it." Exh. F at 2462. As if this language were not horrendous enough, the enactors also added that the "United States already has sufficient race and blood troubles." *Id*.

This blatantly racist ideology was the motivating factor for passing the law known today as 8 U.S.C. § 1326, and absent those racist intentions, the law never would have passed. For this reason, the *Arlington Heights* test applies and the law is presumptively unconstitutional. The burden then shifts to the government to establish that the law would have passed absent this

---

[1] Given the nature of the instant challenge, quotes containing racist language unfortunately must be repeated throughout this motion.

[2] At the time the law was passed, "Mexican" was widely and generally understood as a race, not a nationality. Throughout this motion, "Mexican" will be used as this term was then understood.

1   discriminatory purpose.  The history of this statute makes it clear that they cannot do so; however,

2   should they attempt to do so, the defense requests an evidentiary hearing to decide the matter.

3   **II.    Active Ninth Circuit litigation.**

4   This topic is currently being litigated at the Ninth Circuit Court of Appeals.  On August

5   18, 2021, Chief United States District Judge Miranda M. Du (D. Nevada) issued an order granting

6   a defendant's motion to dismiss the indictment charging him with violating § 1326.  *United States*

7   *v. Carrillo-Lopez*, 2021 U.S. Dist. LEXIS 155741.  The dismissal was granted because section

8   "1326 was enacted with a discriminatory purpose and [it] has a disparate impact on Latinx[3]

9   persons, and the government fail[ed] to show [it] would have been enacted absent racial animus."

10  *Id*. at 1-2.  The government has appealed that order to the Ninth Circuit, and the matter remains in

11  active litigation.  *See generally United States v. Gustavo Carrillo-Lopez,* 21-10233.  The defendant

12  in a Southern District of California case has also appealed a denial of his motion to dismiss his §

13  1326 indictment (which raises the same grounds as above) to the Ninth Circuit Court of Appeals.

14  *See generally United States v. Manuel Rodrigues-Barios*, 21-50145.  That litigation is active.

15  **III.    *Arlington Heights* applies to this challenge.**

16  **A. Three categories of Fifth Amendment Equal Protection challenges to racist legislation.**

17  The Fifth Amendment of the United States Constitution mandates that no one be deprived

18  of life, liberty, or property without due process of law.  U.S. Const. Amend. V.  Implicit in this

19  guarantee is a right to equal protection under the law, similar to that provided by the Fourteenth

20  Amendment.  *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n. 1 (2017).  A federal law

21  can violate the Fifth Amendment right to equal protection under law in three ways.  First, the law

22  may be facially discriminatory.  *See e.g. Loving v. Virginia*, 388 U.S. 1 (1967) (involving a law

23  criminalizing interracial marriage).  Second, a facially neutral law may be implemented or applied

24  in a discriminatory manner.  *See*, *e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356 (1886) (a facially neutral

25  law requiring laundries operated in wooden buildings to hold permits was discriminatorily applied

26  because permits were given to 79/80 non-Chinese applicants but only 1/200 Chinese applicants).

27

28

---

[3] Latino/a/x and Hispanic are not technically interchangeable terms, but colloquially are widely used interchangeably. For consistency, this motion will use the term Latinx.

Third, and relevant to the instant inquiry, a facially neutral law may be enacted with a discriminatory purpose and disparately impact a group, such as a particular race. *See generally Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).

### B.  *Arlington Heights* applies to arguments like Mr. Guadalupe's, which fall in the third category.

Mr. Guadalupe is challenging 8 U.S.C. § 1326 under the third rationale.  He alleges herein that section 1326, a facially neutral law, was enacted with the specific intent to disadvantage his racial group, and that it continues to have a disparate impact on that group.  The Supreme Court has clearly and unequivocally stated that the Fifth Amendment's equal protection clause "demands that racial classifications, especially suspect in criminal statutes, be subjected to the most rigid scrutiny." *Loving v. Virginia*, 388 U.S. 1 (1967) (internal punctuation omitted).  Courts therefore apply the highest level of scrutiny possible to race-based claims such as Mr. Guadalupe's to ensure there is "little or no possibility" that the motive underlying a challenged government action relied on "illegitimate racial prejudice or stereotype." *Id*.  Thus, to prevail, Mr. Guadalupe must satisfy the *Arlington Heights* framework.

### C.  The *Arlington Heights* framework for examining challenged statutes.

The *Arlington Heights* Court provided examining courts with a non-exhaustive list of factors to guide their inquiry; though the list is not exhaustive, the following five factors constitute the "proper inquiry in determining whether racially discriminatory intent existed." *Id*. at 266-268. Those five factors are:

1.  The historical background of the decision;

2.  The specific sequence of events leading to the action under challenge;

3.  Pertinent legislative or administrative history.

4.  Whether the legislature departed from normal procedures or substantive conclusions; and

5.  The impact of the official action and whether it bears more heavily on one race than another.

*Id*.  The threshold for meeting these factors is low, and since legislatures are rarely, if ever,

motivated by a single consideration, the party challenging the statute is *not* required to show the legislature's actions "rested solely on racially discriminatory purposes." *Id.* at 265-66.  They need only show "proof that a discriminatory purpose has been a motivating factor in the decision." *Id.* at 265–66.  *See also Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (quoting *Arlington Heights* to hold that a challenger need not prove discrimination was the "sole purpose" of the challenged action, but rather, only that it was a "'motivating factor'").

Once the party challenging the law shows that a discriminatory purpose was a motivating factor, the burden shifts to the government to establish that "the same decision would have resulted even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 270 n.21.  *See also Hunter v. Underwood*, 471 U.S. 222, 228 (1985).  If the government cannot show that the legislature would have enacted the law in the "absence of the racially discriminatory motivation," the law violates the Fifth Amendment and must be invalidated.  *Id*. at 225.

### D. *Arlington Heights* has been used regularly to invalidate racially discriminatory laws that are facially neutral, including in the immigration context.

The *Arlington Heights* framework has been used time and again to invalidate facially neutral laws enacted with a discriminatory purpose that disparately impact racial groups, including in the immigration context.  For example, one of the first involved a portion of the Alabama state constitution that prohibited those convicted of crimes of moral turpitude from voting.  *See generally Hunter v. Underwood*, 471 U.S. 222 (1985).  This facially neutral law disparately impacted Black Americans, who were ten times as likely to be disenfranchised as a result of the law.  *Id*. at 227.  Challengers of the provision submitted transcripts from the 1901 state constitutional convention (where legislators had originally enacted the provision), several historical studies, and the testimony of two expert historians.  *See id.* at 229.  That evidence demonstrated that the "zeal for white supremacy ran rampant" at the 1901 convention and was a motivating factor underlying the voting provision.  *Id*. at 229–31.  As the provision "would not have been adopted by the convention or ratified by the electorate in the absence of the racially discriminatory motivation," the Supreme Court held that it violated equal protection.  *Id*. at 231.

More recently, the Ninth Circuit applied *Arlington Heights* in a case examining the

1    Deferred Action for Childhood Arrivals ("DACA") program.  In that case, the plaintiffs challenged

2    the rescission of the DACA program, alleging it was motivated by racial animus against the Latinx

3    community.  *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 518 (9th

4    Cir. 2018), *rev'd in part, vacated in part sub nom. Dept. of Homeland Sec. v. Regents of the Univ.*

5    *of Cal.*, 140 S. Ct. 1891 (2020).[4]  In that case, the government argued that a lower standard of

6    review should apply, incorrectly arguing the plaintiffs were arguing about nationality, rather than

7    ethnicity; the Court rejected that argument and applied *Arlington Heights*, pointing out that the

8    plaintiffs had "allege[d] discriminatory intent not only toward 'Mexican nationals,' but also toward

9    'individuals of Mexican heritage, and Latinos.'"  *Id.* at 519 n 29.

10       **E.  The deferential immigration standard (rational basis) is inapplicable.**

11       As detailed above, it is indisputable that race-based challenges to criminal statutes must be

12    subject to the highest scrutiny.  *Loving*, 388 U.S. 1.  Here, Mr. Guadalupe, who is Latino, is

13    challenging a *criminal* law, 8 U.S.C. § 1326, alleging racial discrimination against Latinx people.

14    He has not and does not raise any challenges to section 1326 based on his immigration status.  His

15    claim is entirely about race.

16       The fact that section 1326 involves immigration law is wholly irrelevant.  It is in fact a

17    criminal statute carrying a hefty potential sentence of up to 20 years in federal prison.  Congress

18    chose to step out of the deferential[5] civil immigration world and enter the criminal arena when

19    passing this statute, and by doing so, triggered the heightened protections afforded to criminal

20    defendants.  They cannot have their cake and eat it too.  Thus, *Arlington Heights* applies here.

21    **IV.   Applying *Arlington Heights*, 8 U.S.C. § 1326 was enacted with a racially
         discriminatory purpose.**

22       As detailed below, applying the five *Arlington Heights* factors, 8 U.S.C. § 1326 is clearly

23

24    _____

25    [4] Though the Supreme Court eventually ruled that the DACA plaintiff's allegations were insufficient to establish an equal protection violation, it notably did <u>not</u> disturb the Court's conclusion that *Arlington Heights* applied, and in fact, five justices analyzed the *Arlington Heights* factors on the merits.  *Regents*, 140 S. Ct. at 1915-18.

26    [5] Furthermore, though many civil immigration laws and regulations receive deferential review, not all do.  Indeed, many race-based challenges to civil immigration matters are afforded the heightened *Arlington Heights* standard.  *See e.g. Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1124 (N.D. Cal. 2018) (challenging the Trump Administration's efforts

27    to severely curtail a form of humanitarian relief known as Temporary Protected Status that would terminate the protection for those from El Salvador, Haiti, Nicaragua, and Sudan; plaintiffs alleged the restriction was adopted to

28    further the administration's white supremacist agenda); *La Clinica de la Raza v. Trump*, _ F. Supp. 3d _, 2020 WL 6940934 at *18 (N.D. Cal. 2020) (litigating the public charge ground of immigration admissibility).

unconstitutional.  To prevail, Mr. Guadalupe must show that a "discriminatory purpose has been a motivating factor" in the decision to pass the law.  *Arlington Heights*, 429 U.S. 265-66.  He can do much more than that.  He can and does establish that racism was in fact the primary factor that motivated Congress to pass this law.

## A.  (Factor 1) Historical background of the enaction of section 1326.

The 1920s was a tumultuous era and an increasingly dangerous time for people of color in the United States.  The Ku Klux Klan was experiencing a marked resurgence, with their membership ballooning into the several millions,[6] Jim Crow was flourishing,[7] and the eugenics movement (the scientifically incorrect and blatantly racist theory that humans could be improved through selective breeding, particularly, by ensuring only intra-breeding among the 'superior' white race) was in full swing.[8]  Contrary to currently-held beliefs, eugenics was not a fringe movement limited to Nazi Germany.  In fact, the movement had widespread support in many countries, including the United States.  Popular magazines regularly ran articles warning that new immigrants were racially inferior, impossible to assimilate, and a threat to stability and democracy.[9]  The leader of a major scientific institution argued that neither education nor environment could alter the "'profound and inborn racial differences' that rendered certain people inferior,"[10] and numerous states drafted laws "based on this burgeoning race science, including aggressive sterilization programs."[11]

At the center of the eugenics movement was Dr. Harry H. Laughlin, the director of the Eugenics Record Office.[12]  He was well known for his model sterilization law that many states

---

[6] "The Ku Klux Klan in the 1920s," Public Broadcasting Service (PBS) American Experience Series, *available at* https://www.pbs.org/wgbh/americanexperience/features/flood-klan/.

[7] "Jim Crow Era," Howard University Law Library, *available at* https://library.law.howard.edu/civilrightshistory/blackrights/jimcrow; History.com Editors, "Jim Crow Laws," History.com, Jan. 11. 2022, *available at* https://www.history.com/topics/early-20th-century-us/jim-crow-laws#jim-crow-laws-expand.

[8] *See e.g.* "Eugenics and Scientific Racism," National Institute for Health (NIH)'s Genome Research Initiative Fact Sheet*, available at* https://www.genome.gov/about-genomics/fact-sheets/Eugenics-and-Scientific-Racism.

[9] Mae M. Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* 8 (William Chafe, et al. eds., 2004).

[10] Daniel Okrent, *The Guarded Gate: Bigotry, Eugenics, and the Law That Kept Two Generations of Jews, Italians, and Other European Immigrants Out of America* (2019) at 3.

[11] *Id*. at 38. Those sterilization laws were affirmed in the now infamous decision *Buck v. Bell*, 274 U.S. 200, 207 (1927).

[12] Ngai, *supra* note 9, at 24.

and countries, including the Third Reich of Nazi Germany, used as a template.[13]  During the 1920s, he testified before Congress multiple times and produced four reports that discussed topics such as "race crossing," "mate selection," "fecundity," "racial composition," and the "individual quality of future population."  Exh. B at 2-3.  He also famously testified that Congress must base immigration law and policy on eugenics to "protect American blood from alien contamination" and described immigration control as the "greatest instrument which the Federal Government can use in promoting race conservation" of the United States.  *Id*. at 4, 19.

Relying heavily on these theories, Congress anchored its immigration legislation in eugenics and racial inferiority for the remainder of the decade; it *inter alia* imposed a race-based quota system that favored immigrants from northern and western Europe (countries considered white) and disadvantaged nearly everyone else.[14]

A powerful group opposed this system, but out of economic interests, rather than moral ones.  The agriculture business in the southwest was heavily reliant upon Latinx labor and lobbied hard for an exception to the quota system for countries in the Western hemisphere, where their cheap labor arose from.  This was granted, but as the 1929 Congressional Record makes clear, Congress struggled to undo this western hemisphere exception, worried that Mexicans were "poisoning the American citizen" and diluting white blood stock.[15]

Finally, Congress settled upon a compromise between the two positions, and thus arose the first law that criminalized entering the United States without authorization.  Instead of instituting an immigration quota that prevented Mexicans from coming to the United States in the first place, Congress instead crafted a law that would allow the government to criminalize and prosecute Mexicans who came to the United States – but only after harvest season was over, so they could be exploited as a cheap labor source.[16]  That law was the "Undesirable Aliens Act of 1929," known today as 8 U.S.C. § 1326.

---

[13] Truman State Uni., "Harry Laughlin and Eugenics," *available at* https://historyofeugenics.truman.edu/altering-lives/sterilization/model-law/ (last visited May 5, 2022).
[14] *See* E.P. Hutchinson, *Legislative History of American Immigration Law, 1798-1965*, 212-13 (1981).
[15] 70 Cong. Rec. 3619, 3620 (1929).
[16] *See* 68 Cong. Rec. 2817 (1928).

As this background makes apparent, the historical background of the decision clearly displays discriminatory intent, and thus the first *Arlington Heights* factor weighs heavily in favor of a finding that the statute is unconstitutional.

### B.  (Factor 2) Events leading up to the challenged action.

The specific sequence of events leading to the enactment of the illegal reentry statute also reveals a clearly discriminatory intent.  In the early 1920s, Congress began to focus its legislation around the exclusion of "undesirable" immigrants, which was much more often than not code for people of color.  *See Ave. 6E Investments, LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 505–06 (9th Cir. 2016) (holding that "the use of 'code words' may demonstrate discriminatory intent").  The first such law was the National Origins Act of 1924, which established quotas based on the national origins of U.S. citizens as reflected in the 1920 census and reserved the vast majority of visas for immigrants from the white countries of northern and western Europe.

The quotas created by the National Origins Act were skewed to keep the nation's "racial strains" predominantly Anglo-Saxon.[17]  The law on its face did not count "nonwhite people residing in the United States" toward the quotas it established, and, its newly-created "Quota Board" interpreted this provision to exclude all Black people; all Asians; and all citizens in Hawai'i, Puerto Rico, and Alaska.[18]  Congress and the president accepted these exclusions under pressure to "stand firm against the efforts of 'hyphenates' who would 'play politics with the nation's blood stream.'"[19]

However, as detailed above, this system created a large carve-out for countries in the western hemisphere in response to pressure from agricultural business in the southwest that was dependent upon Mexican labor.  Legislators unhappy with the carve-out sought a creative way to carry out their racist intent without angering powerful business interests, and came up with a "solution" five years later.  That "solution," as detailed above, was to apply criminal, rather than civil, penalties to Mexicans who come into the country without legal authorization, so that they

---

[17] Ngai, *supra* note 9, at 24–25.
[18] *Id*. at 26.
[19] *Id*. at 35.

could be prosecuted after the harvest season and removed from the United States.  In short, this factor weighs also heavily in favor of a finding that the statute is unconstitutional.

### C.  (Factor 3) Relevant legislative and administrative history.

After passage of the National Origins Act of 1924, the Department of Labor (which governed the Bureau of Immigration at the time) began implementing Congress's new quota system.[20]  Then-Secretary of Labor James Davis was a strong advocate of Dr. Laughlin and his eugenics theories, and even used them as the basis for policies he had developed and published under the title "Selective Immigration or None."[21]  Davis warned that the "rat type" was coming to the United States, and that these "rat men" would jeopardize the American gene pool.[22]

Secretary Davis was nevertheless torn between his belief in eugenics and his responsibility to maintain a large labor supply for the railroad and agriculture industries.[23]  Together with devout racist (and suspected Ku Klux Klan member) Senator Coleman Blease,[24] Davis developed a compromise.  Congress would criminalize border crossing *after the fact*, rather than *prevent* it in the first place.[25]  That way, they reasoned, authorities could expel Mexicans through a criminal prosecution after the growing season was over, thereby avoiding resistance from businesses that depended on Mexican labor.[26]

Secretary Davis and Senator Blease found two eager collaborators in the House of Representatives, both of whom were on the powerful Immigration and Naturalization Committee. Representative John C. Box from Texas had long characterized the goal of immigration law as "the protection of American racial stock from further degradation or change through mongrelization."  Exhibit E, Representative Box (TX).  "Restriction of Mexican Immigration," *Congressional Record*, (Feb. 9, 1928) pp. H2817–18.  In one speech at an immigration conference,

---

[20] *See* Hans P. Vought, *The Bully Pulpit: American Presidents and the Immigrant, 1897-1933* (2004) at 174–79.
[21] *Id*.
[22] *Id*. at 174–75.
[23] *Id*. at 216.
[24] For biographical and historical context about Senator Blease, s*ee* B. Simon, *The appeal of Cole Blease of South Carolina: Race, Class, and Sex in the New South*, Journal of Southern History, 62:1, pp. 57–86 (Feb. 1996), *available at* http://www.jstor.com/stable/2211206.
[25] Ian MacDougall, *Behind the Criminal Immigration Law: Eugenics and White Supremacy*, ProPublica (June 19, 2020), *available at* https://www.propublica.org/article/behind-the-criminal-immigration-law-eugenics-and-white-supremacy.
[26] *Id.*

9

Rep. Box stated:

> [t]he Mexican peon is a mixture of Mediterranean-blooded Spanish peasant with low-grade Indians who did not fight to extinction but submitted and multiplied as serfs. Into that was fused much negro slave blood….The prevention of such mongrelization and the degradation it causes is one of the purposes of our [immigration] laws.

*Id*. Box believed this importation was "raising a serious race question" because Mexicans were "essentially different from us in character, in social position." Exh. C at H3619.

Box was joined by the influential Chairman of the House Immigration and Naturalization Committee, Representative Albert Johnson of Washington. Chairman Johnson—for whom the 1924 "Johnson-Reed" National Origins Act was named—was an "energetic and vehement racist and nativist."[27] He headed the Eugenics Research Association, a group that opposed interracial marriage and supported forced sterilizations.[28] He also proudly described his 1924 law as a "bulwark against 'a stream of alien blood, with all its inherited misconceptions respecting the relationships of the governing power to the governed."[29] Within two years of the 1924 Act, Chairman Johnson turned to legislation that would exclude the "Mexican race," explaining that while the argument for immigration restriction had previously been economic, now "'the fundamental reason for it is biological.'"[30]

Following the lead of these legislators, other lawmakers soon "turned to narratives of racial threat to justify restriction."[31] In 1928, for instance, Representative Robert A. Green of Florida delivered a radio speech (later read into the congressional record by Representative Lankford) that advocated for Western Hemisphere quotas. He asserted that countries south of the United States are "composed of mixture blood of White, Indian, and negro." Exhibit F, Representative Lankford. "Across the Borders." *Congressional Record* (Feb. 3, 1928) p. H2462. Immigration from these

---

[27] Dennis Wepman, *Immigration: From the Founding of Virginia to the Closing of Ellis Island*, Facts on File (2001) at 242–43.
[28] *Id.*
[29] Roger Daniels, *Guarding the Golden Door: American Immigration Policy and Immigrants since 1882*, Hill and Wang, 2004, at 55.
[30] Okrent, *supra* note 10, at 3.
[31] Benjamin Gonzalez O'Brien, *Handcuffs and Chain Link: Criminalizing the Undocumented in America*, Univ. Of Virginia Press 2018 *supra*, at Chap. 1.

countries, he believed, created a "very great penalty upon the society which assimilates," and put it at a disadvantage to countries that have "kept their blood white and purely Caucasian."  Exh. F, at H2462.

Chairman Johnson soon convened hearings on new immigration legislation.  *See* Exhibit G, *Hearings Before the Committee on Immigration and Naturalization*, 69th Cong. 69.1.3 (1926). At the first hearing, Chairman Johnson admitted into the record a letter from a constituent in El Paso who urged the legislators to keep out "the scoff and scum, the mongrel, the bootlegger element, from Mexico."  Exh. G, at 30.  In response to this letter, Commissioner General of Immigration Harry Hull, stated, "I think he is right." Exh. G, at 30. Rep. Box added, "I have some letters, Mr. Chairman, just like that." Exh. G, at 30

The following month, the same House committee held a hearing on "The Eugenical Aspects of Deportation," where the principal witness was the well-known eugenicist Dr. Laughlin. Exh. B, at 1.  Early in the hearing, Chairman Johnson praised Dr. Laughlin's prior reports to Congress on race crossing, mate selection, and fecundity, describing one as a "priceless" resource that would "bear intimately on immigration policy."  Exh. B, at 3.

Dr. Laughlin testified about his latest eugenics report, the goal of which was to "protect American blood from alien contamination."  Exh. B, at 3.  When Dr. Laughlin encouraged the committee to conduct future research on the effect of "race crossing within the United States," Chairman Johnson replied that such a study would "be of great use to the committee in its deliberations." Exh. B, at 11.

Dr. Laughlin discussed the need for further research into "mate selection," because "whenever two races come in contact there is always race mixture" even though the "upper levels tend to maintain themselves because of the purity of the women of the upper classes." Exh. B, at 19.  The job of any government, Dr. Laughlin explained, was to "demand fit mating and high fertility from the classes who are better endowed physically, mentally, and morally by heredity." Exh. B, at 19.  By deporting or excluding the "lower races" from the country, Dr. Laughlin contended, "[i]mmigration control is the greatest instrument which the Federal Government can use in promoting race conservation of the Nation." Exh. B, at 19.

In response, Chairman Johnson advocated for Congress's use of the "principle of applied eugenics" to "do everything possible" to reduce crime by "debarring and deporting" more people. Exh. B, at 25. Rep. Box agreed, stating, "we will have to control immigration to suit our own needs or we will lose our national character," which would "spell destruction for the future of America." Exh. B, at 25.

Dr. Laughlin even compared the drafters of deportation laws to "successful breeders of thoroughbred horses," who would never consider "acquiring a mare or a stallion not of the top level" for their "stud farm." Exh. B, at 44. One such successful breeder he knew "weeds out from the lower levels and recruits by purchase"—a process that is "analogous to immigration in man." Exh. B, at 44–45.

When such racial engineering is not possible, Dr. Laughlin warned, deportation of the "undesirable individual" becomes even more critical; otherwise, "we cannot get rid of his blood no matter how inferior it may be, because we cannot deport his offspring born here [referencing birthright citizenship]." Exh. B, at 45. Dr. Laughlin predicted that so long as the nation's borders remained open to immigrants, "there will always be need for deportation, or the 'final selection.'" Exh. B, at 44. In response to this testimony, Chairman Johnson agreed that "[i]mmigration looks more and more like a biological problem, and if the work of this committee results in establishing this principle in our immigration policy we will be well repaid for our efforts." Exh. B, at 46.

Though Chairman Johnson's initial legislation failed, the compromise with the agricultural industry brokered by Secretary Davis and Senator Blease soon made a breakthrough. On January 18, 1929, Senator Blease, on behalf of the Senate Committee on Immigration, submitted a report to the full Senate recommending passage of a law that would penalize "aliens who have been expelled from the United States and who reenter the country unlawfully." Exhibit H, S. Rep. No. 1456, at 1 (1929). It was accompanied by a letter from Secretary Davis on behalf of the Department of Labor advocating for passage of the law. Exh. H, at 2.

The following week, Senator Blease presented this bill on the Senate floor, where he reported that Chairman Johnson had "asked me to get the measures over to the House [within two days] if I possibly could." Exhibit I, Senator Blease (SC). *Congressional Record* (Jan. 23, 1929)

12

p. S2092. The full Senate passed the bill with almost no discussion or debate. Exh. I, at  S2092. Two weeks later, Chairman Johnson submitted a report from the Committee of Immigration and Naturalization to the full House recommending passage of the illegal reentry law. Exhibit J, S. Rep. No. 2397 (1929).

During debate on the bill, Rep. Thomas L. Blanton complained that Mexicans "come into Texas by hordes" and that "my friend Judge Box has been making a just fight against this situation for years." Exh. C, Cong. Rec. 1929.  Rep. Blanton urged the House to "apprehend the thousands of these Mexicans who are in Texas now unlawfully and put them back across the Rio Grande and keep them there."   Exh. C, Representative Blanton, "Deportation of Aliens." *Congressional Record* (1929) p. H3619.  Rep. Schafer added that "[t]hese Mexicans also come into Wisconsin in droves," and Rep. Blanton challenged others to visit the international ports of entry in Texas to see the "hordes that come across the bridges with no intention of ever going back." Exh. C, at H3619. Rep. Fitzgerald then added that from a "moral standpoint," Mexicans were "poisoning the American citizen" because they are "of a class" that is "very undesirable." Exh. C, Representative Fitzgerald, "Deportation of Aliens." *Congressional Record* (1929) p. H3620.  Mere minutes later, the bill passed the House. Exh. C, H3621.  The president signed it into law three days later.  Exhibit L, 70th Cong., Sess. II, Chap. 690, Mar. 4, 1929.

This legislative history easily clears the low threshold of showing that racism and eugenics were a "motivating factor" under the first three factors.  Like other *Arlington Heights* cases, passage of the racially-motivated law followed a predictable pattern.  A broad social movement founded on principles of white supremacy and eugenics gained popular support in the 1920s. *Compare Hunter*, 471 U.S. at 229 (discussing "a movement that swept the post-Reconstruction South to disenfranchise blacks").  Dr. Laughlin, a notorious eugenics "expert," promoted theories of racial inferiority through multiple reports and testimony to Congress.  *Compare Democratic National Committee*, 948 F.3d at 1009 (local Republican chair widely shared a "racially tinged" video suggesting Hispanics were involved in ballot fraud).   Key lawmakers like Chairman Johnson, Senator Blease, and Representative Box (along with Secretary of Labor Davis) promoted these theories and repeatedly endorsed them during legislative sessions. *Compare id.* (state senator

13

repeated "unfounded and often farfetched allegations" of ballot fraud); *Arce*, 793 F.3d at 978–79 (legislators accused ethnic studies program of inciting "racial warfare"). Other legislators expressed similar sentiments. *See id.* Even Congressmen who might not have otherwise endorsed racially motivated legislation were consistently advised of the "inferiority" of the "Mexican race" during legislative sessions in the five years leading up to the law's passage. *Compare Democratic National Committee*, 948 F.3d at 1041 (invoking the "cat's paw doctrine).

In short, the evidence of blatant racial discrimination in the legislative history and events leading up to the passage of the 1929 law easily meets – indeed, greatly exceeds – the threshold required to establish that race was a "motivating factor" to the passage of this law

### D. (Factor 4) Legislature's departure from normal procedures or substantive conclusions.

Examining the fourth *Arlington Heights* factor—whether a decisionmaker departs from "normal procedures or substantive conclusions"—requires courts to consider any "procedural irregularities" leading up to the enactment of a law that could signal a discriminatory intent. *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1164 (9th Cir. 2013). Courts may also consider illogical or counter-intuitive conclusions in the decision-making process. *See, e.g.*, *Ave. 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 507 (9th Cir. 2016) (citing the city's decision to "disregard the zoning advice of its own experts"). Here, not only do the overtly racist statements of legislators during the law's passage show its discriminatory purpose, several irregularities and illogical conclusions in the passage of the 1929 law also implicate this factor.

First, the 1920s was the first and only era in which Congress openly relied on the now-discredited theory of eugenics to enact immigration legislation. Both the 1924 and 1929 immigration laws drew heavily on Dr. Laughlin's debunked beliefs that immigration control was a matter of racial engineering, akin to horse breeding. Illegal reentry remains one of the few laws still in effect from that era.

Second, the racial vitriol expressed during the debates was directed almost exclusively at Mexicans—even though Canadians were also entering the United States in record numbers. *See* Exh. C, at H3621 (stating that 81,506 Canadians entered the United States in 1928). If the 1929

14

Act were motivated by generalized xenophobia or economic anxiety, rather than racism, one would expect legislators to criticize foreigners across the board.  But no legislator referred to Canadians as "mongrels," nor did any complain that "hordes" of Canadians were crossing the border; certainly none objected that Canadians were "poisoning the American citizen."  And a representative from the far-north state of Wisconsin complained only about *Mexicans* taking jobs, not Canadians.  *See* Exh. C, at H3619.

These irregularities show that not only was Congress's passage of the challenged statute based on eugenics and racism, but also that it departed from typical substantive conclusions underlying immigration law.

**E.  (Factor 5) Impact of the official action (and whether it bears more heavily on one race than another).**

Within a year of the 1929 law's passage, the government had prosecuted over 7,000 border crossing crimes, and by 1939, that number rose to over 44,000.[32]  In each of these years, Mexicans comprised no fewer than 84% of those convicted, and often made up as many as 99% of defendants.[33]  Since then, the number of prosecutions has soared; in the last three years, the number of § 1326 cases has risen by nearly 40% to 22,077,[34] making illegal reentry one of the most common federal felonies today.  In sum, applying the five *Arlington Heights* factors shows that racism and eugenics were, at minimum, a "motivating factor" in the passage of the Act.

**F.  The original and current versions of the law are substantially similar.**

Though the original illegal reentry law codified in the "Undesirable Aliens Act of 1929" has been reenacted several times, most notably in the Immigration and Nationality Act of 1952,[35]

---

[32] *Annual Report of the Attorney General of the United States for the Fiscal Year 1939*, 37; Kelly Lytle Hernández, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, 1771-1965, n.6 at 138–39 (UNC Press, 2017); Kelly Lytle Hernández, "How Crossing the U.S.-Mexico border became a crime," The Conversation, Apr. 30, 2017, *available at* https://theconversation.com/how-crossing-the-us-mexico-border-became-a-crime-74604.

[33] Hernández, *supra* n. 6, at 138–39 (citing U.S. Bureau of Prisons, *Federal Offenders*, Fiscal Years, 1931–36.

[34] *See* United States Sentencing Commission, *Quick Facts: Illegal Reentry Offenses*, Fiscal Year 2019, *available at*: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY19.pdf.

[35] *See* June 27, 1952, c. 477, Title II, ch. 8, § 276, 66 Stat. 229; Pub.L. 100-690, Title VII, § 7345(a), Nov. 18, 1988, 102 Stat. 4471; Pub.L. 101-649, Title V, § 543(b)(3), Nov. 29, 1990, 104 Stat. 5059; Pub.L. 103-322, Title XIII, § 130001(b), Sept. 13, 1994, 108 Stat. 2023; Pub.L. 104-132, Title IV, §§ 401(c), 438(b), 441(a), Apr. 24, 1996, 110 Stat. 1267, 1276, 1279; Pub.L. 104-208, Div. C, Title III, §§ 305(b), 308(d)(4)(J), (e)(1)(K), (14)(A), 324(a), (b), Sept. 30, 1996, 110 Stat. 3009-606, 3009-618 to 3009-620, 3009-629.

the law remains substantially the same.  The original version made it a felony for i) noncitizens[36] ii) arrested and deported in pursuance of law to iii) later enter or attempt to enter the U.S.[37]  Today's version is substantially similar and both versions criminalize the same core conduct, to wit, entering the U.S. without government authorization following an expulsion.

### G.  Subsequent reenactments do not change the analysis of whether the original law is unconstitutional under *Arlington Heights*.

Recent Supreme Court jurisprudence confirms that a discriminatory purpose that fueled a law's original enactment remains relevant in determining its current constitutionality.  As detailed below, even if a racist law is later reenacted without mention of the original discriminatory intent, this does not cure the law's unconstitutionality under *Arlington Heights*.

In *Ramos v. Louisiana*, the Court struck down a state law permitting convictions by non-unanimous juries, citing the "racially discriminatory *reasons* that Louisiana and Oregon adopted their peculiar rules in the first place."  140 S. Ct.1390, 1401 (emphasis in original).  Although Justice Alito argued in his dissent that both states later recodified their non-unanimity rules with no mention of race, the majority rejected the notion that this cured the laws' original racial animus, holding that if courts must "assess the functional benefits" of a law, they cannot "ignore the very functions those rules were adopted to serve."  *Id*. at 1401 n.44.  Nor could the justices' "shared respect for rational and civil discourse . . . supply an excuse for leaving an uncomfortable past unexamined."  *Id.* (citation and quotations omitted).

Two months later, the Supreme Court struck down a Montana law prohibiting families from using state-sponsored scholarships at religious schools.  *See Espinoza v. Montana Dep't of Revenue,* 140 S. Ct. 2246 (2020).  The majority relied on the law's "checkered tradition" of underlying religious discrimination, even though it was reenacted in the 1970s "for reasons unrelated to anti-Catholic bigotry."  *Id.* at 2259.  Concurring, Justice Alito invoked his *Ramos* dissent, noting its argument that courts cannot examine impermissible motives underlying the

---

[36] The term noncitizen is used herein to refer to people who are neither U.S. citizens nor nationals; this is done to avoid using the derogatory term "alien" that appears throughout the U.S. Code to this day.

[37] Pub. L. No. 70-1018, ch. 690, 45 Stat. 1551 (1929).  *See also* Immigration History Website, "Undesirable Aliens Act of 1929 (Blease's Law)," *available at* https://immigrationhistory.org/item/undesirable-aliens-act-of-1929-bleases-law/ (last visited May 5, 2022).

original version of a law where states have "readopted their rules under different circumstances in later years." *Id*. at 2268 (quotations omitted).  Justice Alito then stated, "But I lost, and *Ramos* is now precedent." *Id*.  Justice Alito then provided an extensive history of the anti-Catholic and anti-immigrant motives underlying Montana's law, concluding that "[u]nder *Ramos*, it emphatically does not matter whether Montana readopted the no-aid provision for benign reasons.  The provision's 'uncomfortable past' must still be 'examined.'" *Id*. at 2273 (quoting *Ramos*, 140 S. Ct., at 1396, n.44).

In short, the Supreme Court has clearly ruled that the inquiry is *not* whether the Act "would have been valid if enacted today without any impermissible motivation." *Hunter*, 471 U.S. at 233.  Rather, the inquiry focuses on the state of affairs at the time of the original enactment.  Indeed, there is no Ninth Circuit or Supreme Court case that holds a reenactment can cure an *Arlington Heights* deficiency.

In short, as *Ramos* and *Espinoza* both confirm, later reenactments do not cleanse the law of its original taint.[38]  Even if a law is currently serving some other legitimate purpose, this is irrelevant to the constitutional inquiry because laws enacted with a discriminatory purpose cannot be "cured" merely because they might later satisfy a non-discriminatory purpose.  *See Hunter*, 471 U.S. at 233 (rejecting Alabama's argument that "events occurring in the succeeding 80 years had legitimated" a racially motivated disenfranchisement provision).  Rather, when a court determines that a law's "original enactment was motivated by a desire to discriminate . . . on account of race and the section continues to this day to have that effect," the court must conclude that the law "violates equal protection under *Arlington Heights*." *Id.*  Indeed, the Court could not have decided the matter any other way.  It would be profoundly noxious to the Fifth Amendment to allow a law enacted for racist reasons that continues to have a disparate impact to continue to exist, simply because it might now serve some allegedly useful purpose.

**V.      Section 1326 has a disparate impact on Latinx people.**

*Arlington Heights* requires challengers to both show that a law was enacted with a

---

[38] Furthermore, the defense does not concede that the later reenactment in 1952 was devoid of racial animus.  Racism remained a motivating factor in the 1952 reenactment.  Exh. A at 15-26.

discriminatory purpose (which Mr. Guadalupe has done) and that it "bears more heavily on once race than another. *See* 429 U.S. at 265-66.  This is a statistical inquiry that does *not* require Mr. Guadalupe to establish that the disparity is driven by current discrimination against Latinx people. *See Hunter*, 471 U.S. at 233.  We now turn to that latter requirement.  As discussed below, 8 U.S.C. § 1326 continues to disparately impact Mexican and other Latinx defendants like Mr. Guadalupe.

In 2020, over 99% of the people convicted of illegal reentry were Latinx.[39]  That figure is 22% higher than the percentage of Latinx people in the U.S. undocumented community as a whole.[40]  This drastic overrepresentation establishes that § 1326 has a disproportionately high impact on the Latinx community, the very group it enacted to disadvantage.

Nor is this a recent aberration.  In 2000, over 97% of people apprehended at the border were Mexican.  In 2005, Mexicans made up 86% of apprehensions, and in 2010, they made up 87%.[41]  In the last decade, Mexicans have made up a smaller percentage of arrestees due to increased migration from Central America, but combined, the two Latinx groups easily constitute the overwhelming majority of those prosecuted for border crossing.[42]  *See The Committee Concerning Community Improvement v. City of Modesto*, 583 F.3d 690, 704 (9th Cir. 2009) (recognizing a disparate impact on Latinx people where the neighborhoods were "trending" Latinx during the relevant period).

Overall, these disparities are comparable to disparities that have supported other successful *Arlington Heights* challenges.  *See, e.g.*, *Ave. 6E Investments*, 818 F.3d at 497 (concentrating most low-income housing in neighborhoods that are 75% Latinx); *Arce*, 793 F.3d at 978 (targeting a program, 90% of whose enrollees were Latinx); *Community Improvement*, 583 F.3d at 704

---

[39] U.S. Sent. Comm., "Quick Facts Illegal Reentry Offenses," Research and Publications (2020), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY20.pdf.
[40] Migration Policy Institute, "Profile of the Unauthorized Population: United States," 2019, *available at* https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/US (last visited May 5, 2022).
[41] *Border Patrol Total Apprehensions by Mexico and Other Than Mexico, 2000–2019*, https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Total%20Monthly%20Family%20Unit%20Apprehensions%20by%20Sector%20%28FY%202013%20-%20FY%202019%29_0.pdf.
[42] *U.S. Border Patrol Nationwide Apprehensions by Citizenship and Sector, 2007 – 2019*, https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Nationwide%20Apprehensions%20by%20Citizenship%20and%20Sector%20%28FY2007%20-%20FY%202019%29_1.pdf.

1  (excluding 71% Latinx areas from benefits, while extending those benefits to other areas that were

2  only 48% Latinx).

3       The executive branch continues to wield § 1326 as a tool of mass prosecution that

4  disproportionately affects Mexicans and other Latinx communities.  In April 2018, then-Attorney

5  General Jeff Sessions announced a "zero tolerance" policy targeting illegal entry.[43]  The following

6  month, Sessions made clear at an address delivered in San Diego that "the Department of

7  Homeland Security is now referring 100 percent of illegal Southwest Border crossings to the

8  Department of Justice for prosecution.  And the [DOJ] will take up those cases."[44]  A few months

9  later, Mr. Guadalupe was indicted for allegedly violating 8 U.S.C. § 1326.  ECF No. 9.

10       Both Sessions and Stephen Miller, a senior policy advisor to former President Trump and

11  the architect of the zero-tolerance policy,[45] have drawn inspiration from the discriminatory

12  immigration laws of the 1920s.  In a series of leaked emails, Miller lauded the immigration policies

13  of this era, suggesting to a journalist, "[t]his would seem a good opportunity to remind people

14  about the heritage established by Calvin Coolidge, which covers four decades of the 20th

15  century."[46]  Likewise, in a 2015 interview with Breitbart News, Sessions expressed alarm at the

16  rising percentage of "non-native born" Americans, noting that when immigration levels were

17  "about this high in 1924," the President and Congress "changed the policy, and it slowed down

18  immigration significantly."[47]

19       This evidence demonstrates that § 1326 has disparately impacted Mexican and Latinx

20  immigrants and continues to do so today.  Combined with Mr. Guadalupe's showing that racial

21

22

23  [43] *See* "Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry," U.S. Dept. of Justice, Apr. 6, 2018,  *available   at*:   https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-

24  illegal-entry.
[44] "Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump

25  Administration," Dept. of Justice, May 7, 2018, San Diego, California, https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions.
[45] *See, e.g.*, Julie Hirschfeld Davis & Michael D. Shear, *How Trump Came to Enforce a Practice of Separating Migrant*

26  *Families*, N.Y. Times (June 16, 2018), https://www.nytimes.com/2018/06/16/us/politics/family-separation-trump.html?login=smartlock&auth=login-smartlock.

27  [46] Katie Rogers & Jason DeParle, *The White Nationalist Websites Cited by Stephen Miller*, N.Y. Times (Nov. 18, 2019), https://www.nytimes.com/2019/11/18/us/politics/stephen-miller-white-nationalism.html.

28  [47] Adam Serwer, *Jeff Sessions' Unqualified Praise for a 1924 Immigration Law*, Atlantic (Jan 10, 2017), https://www.theatlantic.com/politics/archive/2017/01/jeff-sessions-1924-immigration/512591/.

discrimination was a "motivating factor" in its passage, he has satisfied his initial burden under *Arlington Heights* to demonstrate that the law violates equal protection.

**VI.   The burden shifts to the government to prove section 1326 would have been enacted absent the racial motivation.  They cannot do so.**

As detailed above, Mr. Guadalupe has shown that section 1326 was enacted with a discriminatory purpose and that it continued so have a disparate impact on the Latinx community. As such, the burden now shifts to the government to demonstrate that the "Undesirable Aliens Act of 1929" would have passed "even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 266–68, 270 n.21.  *See also Hunter*, 471 U.S. at 228 (shifting the burden to the law's defenders to "demonstrate that the law would have been enacted without this factor"). The overwhelming historical evidence indicates the government cannot meet this burden, but should the government attempt to do so, the Court should set an evidentiary hearing to determine this factual question.  If the Court sets an evidentiary hearing, the defense anticipates putting on academics and historians as expert witnesses.  Courts frequently hold evidentiary hearings to determine *Arlington Heights* factors and rely on this type of evidence in making their factual determinations.  *See e.g., Hunter*, 471 U.S. at 229 (relying on evidence at trial of state legislative proceedings, "several historical studies, and the testimony of two expert historians"). Indeed, the Supreme Court has found error where a lower court granted summary judgment against a defendant "without an evidentiary hearing" on a legislature's disputed motives under *Arlington Heights*.  *Hunt*, 526 U.S. at 545.

**VII.   Section 1326 is unconstitutional.**

For the reasons set forth above, Mr. Guadalupe respectfully moves this Court to grant his requested relief.

Respectfully submitted,

HEATHER E. WILLIAMS
Federal Defender

Date: May 5, 2022                    */s/  Christina Sinha*
CHRISTINA SINHA
Assistant Federal Defender
Attorneys for Defendant
NOE FÉLIX GUADALUPE